IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
_____

In re the Application of:

EDUARDO E. BENITEZ-READ,

      Petitioner,

and                                                           No. CIV 04-1079 BB/RLP

JENNIFER L. BENITEZ-JONES,

      Respondent.

COURT'S FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND
ORDER DENYING PETITION

      THIS MATTER is before the Court on the Petition of Eduardo E. Benitez-Read seeking to have the four children he fathered with Respondent, Jennifer L. Benitez-Jones, be returned to the Republic of Mexico. Having taken testimony on September 30 and October 1, 2004, considered the briefs and argument of counsel, and being otherwise duly informed, the Petition will be Denied. These Findings of Fact and Conclusions of Law will constitute the opinion of the Court.

*Findings of Fact*

1.     This petition is filed pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980

("Convention"), and implemented by 42 U.S.C. § 11603(b), the International Child Abduction Remedies Act ("ICARA"), which confers jurisdiction on this Court.

2. Petitioner and Respondent were married in the United States in 1990 and lived here until 1992 during which time they had two children. The family moved to the Republic of Mexico for the first time in 1992.

3. Four children were born of this union:

    Maria Xochitl Benitez-Jones, born August 24, 1990, age 14;

    Sophia Itzi Benitez-Jones, born January 27, 1992, age 12;

    Eduardo Teoxiuh Benitez-Jones, born October 17, 1993, age 10; and

    Virginia Mixtli Benitez-Jones, born June 29, 1995, age 9.

4. Petitioner and Respondent have had a dysfunctional marriage during which they have separated repeatedly and the children have been back and forth between New Mexico and the Republic of Mexico for extended periods on at least five occasions.

5. Each of the children has been enrolled in the schools of both New Mexico and the Republic of Mexico on various occasions and for varying lengths of time.

6. At various times over the last eight years, the children have been split up with one or more being with their father in Mexico and the others being with their mother in New Mexico.

7. **Although no separation or divorce petition has been filed, child custody has been an issue in the marriage for approximately a decade. In October 2001, the Second Family Court of the Judicial District of Morelos, State of Chihuahua, awarded Petitioner and Respondent joint custody of the children.**

8. **On November 8, 2002, Respondent removed the children from their home in Chihuahua, Mexico, and fled to Las Vegas, New Mexico, to live with her mother. Respondent then purchased a home located in Las Vegas, New Mexico. The parties again worked out an agreement and in January 2003, Petitioner returned to Chihuahua with his son, Eduardo, and a couple of days later Respondent returned to Chihuahua with Maria, Sophia, and Virginia.**

9. **On June 23, 2003, Respondent, for the fourth time, removed the children from Chihuahua and returned to Las Vegas, New Mexico. Petitioner went to Las Vegas on three separate occasions attempting to take the children back to Mexico.**

10. **In December 2003, the three girls were living with Respondent in New Mexico and Eduardo (Lalito), was living with Petitioner in Mexico. Petitioner represented he would again like to be reconciled and live with Respondent and the girls in the United States. He drove the family to El Paso, ostensibly to look for a house. Petitioner then informed the children he was "putting something" in Respondent's coffee to put her to sleep so he could take them across the border. He threatened them if they woke Respondent, and displayed ropes and a stun gun.**

**Respondent awoke in Juarez and attempted to wrestle control of the moving vehicle from Petitioner. Petitioner called the police and Respondent was arrested. Respondent then agreed to move with the children to Chihuahua.**

11. **Although the exact timing is unclear, court sanctioned family psychologists interviewed all of the family and engaged in some level of counseling during this stay in Mexico.**

12. **In March 2004, Respondent again took the children from Mexico to New Mexico.**

13. **Petitioner then sought *ex parte* and eventually received a decree of the Second Family Court, Court of the Morelos Judicial District, Republic of Mexico, that he was entitled to custody of all four children and directing that they be returned to Mexico.**

14. **Petitioner filed this application under the Hague Convention and the ICARA with the Mexican Central Authority on May 4, 2004.**

15. **Since the birth of the children, Petitioner physically attacked Respondent on more than one occasion. He also threw an object at Respondent at least once and on another occasion attempted to smother her.**

16. **Dr. David Miller examined the children on two occasions in his role as the school psychologist for the Las Vegas Public Schools, and he testified in that capacity. (Tr. 60.) The parties agreed he was an expert in child psychology.**

17. **Dr. Miller characterized it as a "pattern of habitual abuse, physical abuse and verbal abuse."  Dr. Miller testified Sophia and Maria told him that "their father had [a] consistent kind of derogatory words he used when he was angry at them." (Tr. 66.)  He also expressed concern for their physical safety as Petitioner was reported to have hit the children hard enough to knock them down.  (Tr. 65.)**

18. **Dr. Miller reported Lalito had witnessed Petitioner trying to smother Respondent with a pillow.  (Tr. 66.)  This incident was also independently recounted by Lalito during his interview with the Court.**

19. **Petitioner often displayed a violent temper in front of the children.  In addition to physically hitting Respondent in the presence of the children, he demonstrated road rage and threatened other motorists.  (Tr. 68-9.)  During one of these incidents in which Petitioner got into a fistfight, Lalito was frightened enough to hide on the floorboard of the vehicle.  (Lalito, interview 20-22.)**

20. **At this point in time, the children are acclimatized and well settled in Las Vegas, New Mexico, and based on the entire record, including Dr. Miller's testimony, appear to be excelling in school as well as extracurricular activities.**

### *Conclusions of Law*

1. **This Court has jurisdiction over the parties and subject matter of this dispute. 42 U.S.C. § 11603.**

2. **Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies.**

3. **"The removal or retention of a child is wrongful where 'it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention,' where such rights were actually exercised by the parent seeking return of the child." *Shealy v. Shealy*, 295 F.3d 1117, 1122 (10th Cir. 2002) (quoting Hague Convention, Article 3).**

4. **Legally, the children would be habitual residents of the Republic of Mexico but for the circumstances surrounding their most recent entry and sojourn in that country. Petitioner kidnaped Respondent by drugging her and taking her into Mexico under the false representation that they were going to look for a house in El Paso, Texas. (Tr. 89-90.) At the time he was also in possession of ropes and a stun gun. Respondent was coerced into remaining in Mexico through March 2004 by use of psychological and physical abuse.**

5. **Habitual residence cannot be a result of kidnaping, coercion, and abuse but must be voluntary and intentional. *Tsarbopoulos v. Tsarbopoulos*, 176 F. Supp. 2d 1045, 1055 (E.D. Wash. 2001). Since it appears the children were involuntarily**

**taken to Mexico along with Respondent, this Court cannot hold their habitual residence was properly in the Republic of Mexico.**

6. **Even if habitual residence of the children was Mexico, this Court would deny the Petition based on clear and convincing evidence of the grave risk to the safety of the children.** *See Danaipour v. McLarey*, **286 F.3d 1 (1st Cir. 2002) (district court should determine abuse rather than returning children to habitual residence for such a determination).**

7. **The record contains clear and convincing evidence that Petitioner abused each of the children physically by hitting them repeatedly. These punches and slaps often left red marks and even bruises. Occasionally, he hit them hard enough to knock them to the ground. Additionally, Petitioner used psychological intimidation to coerce each of the children to perform massages on his feet, legs and back "if they loved him." He also called them names like "Stupid, Skinny, and Dumb, Ugly." (Maria, interview, p. 17.) Finally, on those occasions when the children lived with Petitioner in Mexico and Respondent lived in New Mexico, the children were frequently left home alone. This was particularly frightening for Lalito who lived alone with Petitioner when he was 7-8 years old.** *See Walsh v. Walsh*, **221 F.3d 204 (1st Cir. 2000);** *Tsarbopoulos, supra; Rodriguez v. Rodriguez*, **33 F. Supp. 2d 456 (D. Md. 1999);** *Ostevoll v. Ostevoll*, **2000 U.S. Dist. Lexis 16178, 2000 WL 1611123 (S.D. Ohio 2000);** *Strout v. Campbell*, **864 So. 2d 1275**

(Fla. App. 2004).  *See also* James Alfieri, *Trauma, Recovery, and Transnational Child Abduction: Posttraumatic Stress Disorder as Psychological Harm Under the Hague Convention on the Civil Aspects of International Child Abduction*, 5 Or. Rev. Int'l L. 40, 50-55 (2003).

8. As to Maria Xochitl Benitez-Jones, the Court would further find that "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of her views."  Hague Convention, Article 13.  It was clear from both her testimony and interview, Maria was very perceptive and articulate and felt strongly about not returning to live with her father.  Dr. Miller also recognized Maria was composed, calmly and readily answered questions, and was sufficiently intelligent and articulate that her opinions are entitled to significant weight. (Tr. 69-70.)  While the record supports Petitioner's position that Maria is sensitive to her mother's wishes, it is also clear she fears her father's "violence."  She is also apprehensive that her father would hit her even more "because I confessed a lot of stuff that he wouldn't like to come out of my mouth."  (Maria, interview, p. 38.)  She also stated she would not go back to Mexico willingly even if her mother did return.

Any fact or legal authority not incorporated herein is deemed Denied.

**O RDER**

**Based on the Findings and Conclusions herein, Petitioner's Petition for return of Maria Xochitl Benitez-Jones, Sophia Itzi Benitez-Jones, Eduardo Teoxiuh Benitez-Jones, and Virginia Mixtli Benitez-Jones to the Republic of Mexico is DENIED.**

**DATED this 14th day of October, 2004.**

**BRUCE D. BLACK**
**United States District Judge**

**For Petitioner:**
   **Twila B. Larkin, SUTIN THAYER & BROWNE, Albuquerque, NM**

**For Respondent:**
   **Joseph J. Mullins, RODEY DICKASON SLOAN AKIN & ROBB, Albuquerque, NM**